*In re* T.H. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Laverne Harper, Respondent-Appellant).

Third District   No. 3—85—0489

Opinion filed October 17, 1986.

John F. Vickers, of Brusatte & Vickers, of Ottawa, for appellant.

Gary L. Peterlin, State's Attorney, of Ottawa (Gerry R. Arnold, of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

The 10-year marriage of Laverne and Brenda Harper ended in a September 1983 divorce. Three children were born of the marriage; J.H. in 1976, C.H. in 1979, and T.H. in 1981. Brenda was awarded custody of the children, and Laverne was granted liberal visitation.

On October 19, 1984, the La Salle County State's Attorney filed a four-count petition alleging that the two female children were sexually abused by Laverne. It was further alleged that this contributed to an environment injurious to the welfare of all three children. The petition prayed for an adjudication of wardship and for further relief under the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 701—1 *et seq.*). Following an extensive adjudicatory hearing, the court found that acts of sexual abuse had been committed against C.H. The court ultimately entered an order for protection severely limiting Laverne's visitation and ordered that he undergo counseling. We affirm. Because this case was extremely close, an extensive review of the testimony is required.

Jean Tennyson testified for the State. She is the maternal grandmother of the children. In April 1984 C.H. was having a bath at Jean's house. She testified that C.H. was tickling herself "there" in the bathtub. Jean asked if anyone else bothered or tickled her down there. C.H. responded that Daddy did. She further testified that she told Brenda about this, but Brenda did not report it to anyone.

In early October 1984, Jean had both girls alone after sending Brenda out to do the laundry. She bathed them together. She first took C.H. out and dried her. At the same time, she noticed T.H. fondling herself in the vaginal area. Jean asked if anyone else ever bothered her there. T.H. responded that Daddy did. C.H. and T.H. then argued over whether their father actually did what T.H. described. T.H. said he did it on the couch in the living room. C.H. said, "he don't no more" and T.H. said, "he puts you outside to play and then he do." When Brenda returned to Jean's house, they repeated their story to

her.

On cross-examination, Jean admitted that she had discussed the allegations with the children between the date of the petition and the adjudicatory hearing. She also admitted hiring an attorney to represent Brenda in the instant action, although no counts were actually directed against her. She had previously hired an attorney for Brenda in a post-decree dispute over utility bills.

Randy Constantine, an officer with the Department of Children and Family Services (DCFS), testified that on October 15 a report of child abuse was received on the hotline. He went to Brenda's home in Mendota the next day. He interviewed each child individually, with Brenda present but not participating. Constantine used anatomically correct dolls to assist the children in describing what happened. T.H. referred to the male doll's penis and the female doll's vagina as "private parts." T.H. told Constantine that Daddy touched her private part with his hand and it tickled. Constantine asked if anyone kissed her on her private part and T.H. said her Daddy did. This was done at Laverne's apartment in his bedroom and bathroom. She also recalled having once kissed her father's private part. C.H. also referred to the doll's vagina as a "private part." She said that her father rubbed her private part but did nothing else. This happened in the bedroom and bathroom. C.H. also stated that this occurred three months ago.

Constantine interviewed Laverne Harper in the presence of an Ottawa police officer. Laverne denied touching the vaginal areas of his daughters in a sexual manner. He described a game in which he would blow on their bellies to tickle the children.

On cross-examination, Constantine stated that he made no contemporaneous notes or tape recordings of these conversations. He also did not get any indication from the children of the frequency of the alleged touchings.

Brenda Harper testified that she called the hotline the next day after what happened at her mother's house. She essentially corroborated Constantine's account of the children's descriptions, but said that T.H. said nothing about kissing her father's private part. C.H. told Constantine that Daddy touched her private part, but that it did not hurt.

On cross-examination, Brenda exhibited confusion over how long after learning of the abuse she waited to call the hotline. Laverne's attorney elicited considerable testimony concerning the friction she had been experiencing with Laverne over her activities with men. Specifically, she had allowed a black man to move in with her and the children. Laverne had expressed his displeasure about this to her

many times. Brenda also testified as to an incident immediately preceding the abuse allegations in which she had hired an attorney to write a letter to Laverne concerning the way in which he had the girls' hair cut. Brenda characterized this as a minor incident, although she did say something to the effect of "you're not going to get away with this."

The trial judge then interviewed C.H. and T.H. *in camera*. C.H. told the judge that she had told Randy Constantine that her father had touched her private part. She also related that her father had kissed her there as well. She also stated that she did not touch her father's private part.

After hearing testimony from Laverne denying any improper conduct, the court entertained a motion for a directed finding that the children had not been abused. Because there was nothing before him besides the uncorroborated statements of the children to third persons, the judge indicated that, all things being equal, he would ordinarily grant the motion. However, apparently due to some lingering doubts, the motion was denied pending the testimony of C.H.

The court found C.H. a competent witness. She testified to being both touched and kissed on her "important part." In many respects, her testimony contradicted details of the abuse related by Randy Constantine, Jean Tennyson and Becky Cattani, a social worker who took a taped statement from the children a day after the interview with Constantine. C.H. also used dolls in giving her testimony. She demonstrated graphically how her father had both touched and kissed her vaginal area. The State rested.

Laverne's case in chief essentially exposed various contradictions in the children's testimony. For example, Jean Tennyson testified that the children had told her about the abuse on the first Tuesday in October. Laverne pointed out that, in spite of this knowledge, he was allowed to exercise complete, unsupervised visitation without a word of protest from his ex-mother-in-law. Laverne further testified that Brenda had told him that her first knowledge of the abuse allegations was when Randy Constantine came to her house on October 16. Finally, Laverne told of an incident where he saw a spot on C.H.'s underwear while undressing her for a bath. He examined her vagina for bleeding. He found none. He made no mention of his findings to Brenda.

J.H. testified to the game of his father blowing on the children's bellies to tickle them. C.H. had previously testified that her father never did this.

A tape was played of Becky Cattani's interview with the children.

The statements given by C.H. and T.H. were both internally inconsistent and contradictory of other stories told at other times. Moreover, the questions were so leading and suggestive that the value of the interview is limited at best.

The court found against Laverne. In denying a later motion to reconsider, the court made the following remarks:

"Her statement in court that it happened, the one in-camera discussion with the Court before we actually put her on as a witness, I believe that was the demonstration that she gave with the so-called anatomically correct doll. Doesn't look like anybody's anatomy that I ever saw, but that's what it's called. I can best characterize her demonstration of the touching of the vaginal area of that doll as a very sensuous, caressing motion that she made with her hand. It was not a mere touching inadvertent or in the process of giving someone a bath. It was sensuous and very explicit on her part, and for a child her age, it's something that I don't believe she could be coached on. It was a demonstration of what she remembers happened as done to her by her father. And the same applies to the -- her demonstration, her dramatic demonstration of kissing of the vagina. If there were no other evidence than that, it would be sufficient for this Court to conclude that she was not only telling the truth when she so testified and demonstrated, but the demonstration clearly says the Court, by the greater weight of the evidence, or more than that, by clear and convincing evidence, that this conduct happened. I found that it happened. And those findings will remain."

Laverne embarks on a two-pronged attack on the sufficiency of the evidence. He begins by citing cases holding that the testimony of children in indecent-liberties cases must either be clear and convincing or corroborated to sustain a finding of guilt. (*People v. McGrath* (1963), 28 Ill. 2d 132, 190 N.E.2d 746.) He then turns to a personal injury case where the jury apparently rejected the uncontradicted testimony of a young child. (*Sobotta v. Carlson* (1978), 65 Ill. App. 3d 752, 382 N.E.2d 855.) *Sobotta* allegedly holds that the testimony of small children is inherently suspect.

Neither case is on point. *McGrath* is a criminal case. In order to protect the reasonable doubt standard in cases where the testimony of a child is critical, the court found it necessary to interpose a higher threshold of competency and sufficiency. *Sobotta* only holds that the finder of fact is free to reject the testimony of a small child.

Here, certain statutory standards apply. To begin with, section 4—

6(1) of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 704—6(1)) provides:

"The standard of proof and the rules of evidence in the nature of civil proceedings in this State are applicable to Sections 2—3, 2—4 and 2—5."

This alone belies the notion of a higher threshold of competency and sufficiency. Moreover, a specific subsection of section 4—6 speaks to the question of children's testimony. To wit:

"Previous statements made by the minor relating to allegations of abuse *** shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse ***." Ill. Rev. Stat. 1985, ch. 37, par. 704—6(4)(c).

■ It can thus be seen that the legislature has already considered the question of how to view the testimony of a child. Although neither of the provisions cited addresses Laverne's argument head-on, it is clear that there is nothing in the statute which requires that a minor's in-court testimony be treated differently than in any other civil proceeding. The nature of these proceedings suggests that this is the proper method of treating such testimony. Although important interests are at stake in these cases, a person's liberty is not one of them. Consequently, the rights and protections afforded to an accused due to constitutional considerations are not present here. Accordingly, we reject any contention that the testimony of C.H. must be viewed differently from any other civil case.

■ We now turn to the question of the sufficiency of the evidence supporting the court's findings. A finding of abuse is entitled to great deference and will not be disturbed unless it is against the manifest weight of the evidence. (*In re Simmons* (1984), 127 Ill. App. 3d 943, 469 N.E.2d 215.) Furthermore, in cases such as this where so much depends on both an in-court demonstration and the demeanor of the person making the demonstration, we are particularly reluctant to substitute our findings for those of the court.

It is indisputable that the State's case was far from perfect. The stories told by the children differ in details both major and minor. There is a glaring lack of evidence as to how often the touchings occurred, who was present and what forms the touchings took. Also, there is a near-fatal absence of evidence of sexual animus behind the touchings. It was not until C.H. demonstrated how her father touched and kissed her that the intent to arouse or gratify could be inferred.

Even so, we are troubled that the State did not mention in its petition that Laverne kissed or placed his mouth on his daughters' geni-

tals. This is surely due to the lack of any mention of such conduct in the statements taken by Randy Constantine and Becky Cattani. Laverne argues at length that this and other discrepancies are the result of a carefully concocted scheme by Jean Tennyson and/or Brenda to fabricate or bolster the children's stories. Although the tale told by Laverne is worthy of the most imaginative soap opera script-writer, it is but one of many inferences which the court was free to reject.

■ As stated above, this is a case where great deference to the findings of the trial court is owed. Laverne's counsel was allowed to introduce all of the evidence necessary to advance his client's theory of the case, including the impeachment of Brenda's witnesses. In cases where the court has not refused to admit important evidence, it is especially important that we not substitute our judgment. Although the court probably could not have made a finding that a particular molestation occurred on an exact date, the record does support the conclusion that some abuse occurred.

Laverne argues that the court erred in allowing counsel for Brenda to participate actively in the proceedings. The record reveals that counsel acted more or less as co-counsel to the assistant State's Attorney. The gist of Laverne's argument is that while Brenda was a proper party to the case, she was not in fact a respondent to any of the charges made in the petition.

■ We believe the court acted within its discretion in allowing counsel for Brenda to participate. Under section 1—20 of the Juvenile Court Act, parties respondent have, *inter alia*, the right to be represented by counsel. (Ill. Rev. Stat. 1985, ch. 37, par. 1—20.) Where the party asserting the right to counsel is not currently charged with conduct affecting his or her status, it is up to the trial court to decide what form this representation should take. Furthermore, it is difficult to see how Laverne was prejudiced by the participation of Brenda's attorney.

■ Finally, Laverne challenges as a condition of the order of protection the requirement that he seek counseling. He argues that any counseling should be limited to problems relating to the abuse of his children.

This is clearly incorrect. Under section 5—5 of the Juvenile Court Act, the court may set forth "reasonable conditions of behavior" to be observed. The court's order is ultimately reasonable. It was specifically left to the mental-health professionals to determine the scope of treatment necessary for Laverne. No authority to the contrary is cited.

Accordingly, we affirm the judgment of the circuit court of La Salle County.

Affirmed.

SCOTT, P.J., and STOUDER, J., concur.